1
2
3
4          UNITED STATES DISTRICT COURT
5              DISTRICT OF IDAHO
6

7   UNITED STATES OF AMERICA,

8              Plaintiff,                    NO. CR-09-44-N-JLQ

9   vs.

10                                           **FINDINGS OF FACT,
    CONCLUSIONS OF LAW;
11                                           MEMORANDUM OPINION AND
    GERALD EDMUND FRY,                       ORDER DENYING IN PART,
12                                           GRANTING IN PART, AND
               Defendant.                    RESERVING IN PART MOTION
13                                           TO SUPPRESS; ORDER
                                             EXCLUDING TIME**
14

15          This matter came on before the court on Defendant's Motion to Suppress (Ct.

16   Rec. 12). The Defendant seeks to suppress all evidence obtained from his vehicle on

17   February 6, 2009 and his statements allegedly made thereafter based upon a claim

18   that his arrest was illegal.  The Defendant also seeks to suppress any statements

19   allegedly made after his arrest based upon his claim that the investigating agents

20   disregarded and failed to clarify his request for counsel.

21          The court held an evidentiary hearing and heard argument on May 8, 2009. At

22   the hearing, Defendant appeared personally and was represented by Arthur W.

23   Verharen, his then court-appointed counsel. Mr. Verharen has since been allowed to

24   withdraw as counsel for the Defendant since Mr. Verharen has since undertaken a

25   position as a Deputy Prosecuting Attorney for Kootenai County, Idaho. The

26   Government was represented by Nancy Cook, Assistant United States Attorney. At

27   the conclusion of the May 8, 2009 hearing the court directed counsel to file

28   ORDER - 1

1   supplemental briefs on or before May 15, 2009, specifying that counsel address the
2   applicability of *United States v. Rodriguez*, 518 F. 3d 1072 (2008). Those briefs were
3   filed on May 15, 2009 and this matter was deemed submitted to the court on that date.
4        The court has considered the testimony, argument, pleadings, memoranda, and
5   other materials submitted by the parties as well as the law and facts relating to this
6   motion. Being fully advised, the court renders the following Findings of Fact,
7   Conclusions of Law, Memorandum Opinion, and Order.

8   **I.      FINDINGS OF FACT**

9   A. The Arrest

10       On Friday, February 6, 2009, the Defendant was driving a Toyota pickup in
11  Pullman, Washington with two passengers.  Police officers  identified one of the
12  passengers, James Demars, as having an outstanding warrant.  The officers executed a
13  traffic stop of the vehicle. Demars was ordered out of the vehicle and subsequently
14  arrested.  The officers each observed an open knife sitting on the lap of the center
15  passenger, William Boyd.  The officers removed the knife and ordered Boyd out of
16  the vehicle.  Boyd revealed he had another knife with an 8 in long blade on his
17  person.  Defendant Fry had a vest in his lap that concealed his lap. The officers
18  ordered Fry out of the vehicle for officer safety. As Fry was removed from the
19  vehicle, the vest fell to the ground. Defendant was handcuffed and patted down for
20  weapons.

21       Detective Patrick observed a box of .22 caliber ammunition on the floor board
22  of the driver's seat area.  Patrick also picked up the vest and began manipulating the
23  vest in his hands, specifically a pocket containing what he thought to be a cylindrical
24  object.  He came to the belief that the object was a drug pipe, looked inside the
25  pocket, and found a drug pipe with residue.  When he opened the vest pocket he also
26  saw syringes.  Based upon the pipe and the syringes, he placed Defendant under
27  arrest for unlawful use of drug paraphernalia.

28  ORDER - 2

Following Defendant's arrest for that offense, Detective Aase conducted a search of Defendant's person. That search yielded among other items, a small amount of methamphetamine in a container, two shotgun shells and a pocketknife. Defendant was taken to the Whitman County Jail.

B. Defendant's First Interview

Prior to his arrest, the Quad Cities Drug Task Force (QCDTF) had begun an investigation of the Defendant for the alleged distribution of methamphetamine and the illegal possession of firearms. Detective Rodney Wolverton (of the Moscow, Idaho City Police Department) was assigned to the Quad Cities Drug Task Force (QCDTF) and took part in the investigation. Cooperating witnesses had previously been interviewed by law enforcement and revealed information regarding the Defendant.   The Defendant had prior felony convictions and was restricted from possessing firearms or ammunition.

In January, 2009, after having been informed of the QCDTF's investigation, Bureau of Alcohol, Tobacco, Firearms and Explosives Agent Christopher Smith opened his own investigation of Fry. Smith reviewed several recorded phone calls revealing information about the Defendant. After Detective Wolverton learned that Fry had been arrested in Whitman County on February 6, 2009, he then notified Agent Smith.

Following Fry's arrest in Pullman, Agent Smith obtained a  federal search warrant for the  Defendant's residence in Spokane.  Defendant's wife and two school-aged children were at the residence when the warrant was executed on the evening of February 6, 2009.  Executing the warrant, law enforcement officers discovered additional ammunition, needles, digital scales, plastic Glock speed loader, firearms parts, a firearm cleaning kit, and baggies of various types and sizes with white residue in them.  Agents also seized a Czech model 52 rifle from the corner of the bedroom closet.  Defendant's wife was arrested on outstanding warrants not having to do with

ORDER - 3

the investigation of the Defendant.

On Saturday, February 7, 2009, the day after the Defendant's arrest and the execution of the search warrant, Agent Smith and Detective Wolverton went to the Whitman County Jail and engaged in an approximately three hour interview of the Defendant, beginning around 11:00 a.m.  The officers went to the jail with the intent of seeing whether the Defendant would talk about his alleged involvement in drug distribution and possession of firearms. *See* Ct. Rec. 39 at 30, ln 21 ("That's what I drove down there to do was to afford him that opportunity....to cooperate in the investigation."); *Id.* at 60, ln 11-14.  A jail officer brought the handcuffed Defendant to a small interview room at the Sheriff's office where Agent Smith and Detective Wolverton awaited him.  The contact between Smith, Wolverton and the Defendant was not recorded.

It is undisputed that Agent Smith initiated conversation with the Defendant without *Mirand*izing the Defendant.  Agent Smith identified himself and Detective Wolverton to the Defendant and told the Defendant the reason they were there was because he was being investigated for distributing methamphetamine in Idaho and Washington. At this time, and as discussed more fully, *infra*, at pages 6-8. The Defendant asked Agent Smith either "Do I get to have a lawyer sit in?" or "Do I need an attorney?"   Ignoring Fry's "lawyer" question, Agent Smith proceeded with the "softening-up" process by telling Fry that he "anticipated getting a federal indictment against him for narcotics distribution and possibly firearms charges, either in Idaho or in Washington." Ct. Rec. 39 at 30, ln 6-8.

Agent Smith also told the Defendant of the execution of the search warrant at Fry's home the previous evening.  Agent Smith explained to the Defendant that law enforcement had taken steps to avoid "any kind of dynamic entry" because they knew his wife and children were there. Ct. Rec. 39 at 27, ln 6.  Agent Smith testified Fry stated that he "appreciated that" Ct. Rec. 39 at 27, ln 10; 66, ln 23. Smith  told the

ORDER - 4

Defendant that his wife had been arrested, but that his "children were fine." Agent Smith explained who the children had been released to in order to see whether Defendant was okay with that, and the Defendant apparently responded affirmatively. Ct. Rec. 39 at 33, ln 4.  Defendant became emotional when the agents told him what had taken place at his house.  Ct. Rec. 39 at 62, ln 25; *Id.* at 63, ln 11-13; Ct. Rec. 39 at 116, ln 19-23.

Agent Smith's dialogue continued on without *Miranda* warnings or response to Fry's "lawyer" question, as he informed the Defendant of the detail of his knowledge of the Defendant's alleged criminal activity.   Among other things, he told the Defendant about how they knew he was distributing methamphetamine in locations other than Spokane and that they had a phone record listing of 153 calls between he and the person they believed to be his source of meth, Larry Day.   Smith told Fry about the firearm and ammunition they had recovered from the search of the house.

Prior to receiving any *Miranda* warnings, the Defendant "voiced his concerns" that in his opinion law enforcement "didn't have enough dope on him." Ct. Rec. 39 at 31, ln 20-22.  Agent Smith then "explained the federal system" to the Defendant. He told Fry of potential firearm charges and explained a charge of conspiracy.  Agent Smith told Fry that in federal court he would be appointed an attorney.  Agent Smith also talked to the Defendant about federal penalties. He told him that with his criminal history, "it was conceivable that Mr. Fry could potentially spend the rest of his life in federal prison."  Ct. Rec. 39 at 37, ln 7-9; *Id*. at 101, ln 13-20.  Agent Smith then told Fry how cooperation could benefit him and about "acceptance of responsibility."  Agent Smith explained that if Fry cooperated, it would be passed on to the prosecutor and that cooperation usually resulted in a lower sentence in federal court.  Ct. Rec. 39 at 37, ln 17-19.

Agent Smith also told the Defendant of his "bus analogy" to encourage him to cooperate. Agent Smith testified that the analogy is that "when you have a conspiracy

ORDER - 5

the first people that get on the bus [by cooperating] get the best seat. The ones that get on late get a seat in the back. And the ones who don't get on at all will get run over." Ct. Rec. 39 at 40, ln 20-25.  Agent Smith testified he told Fry two to three times that it was up to him whether he wished to cooperate, but that his "deal would never be better than it was that day."  Ct. Rec. 39 at 30, ln 21-22; *see also*, Ct. Rec. 18 at 6-7.  The Defendant told Agent Smith he'd been an addict all his life and appeared to agree to "get on the bus."  At no time did Agent Smith clarify Fry's question as to whether he needed an attorney.

Agent Smith then pulled out his *Miranda* card and read Fry the following: "You have the right to remain silent. Anything you say can be used against you in court. You have the right to consult with an attorney and have them present during questioning. If you cannot afford an attorney one will be appointed to represent you prior to any questioning. Do you understand your rights, these rights? And if so, are you willing to waive those rights and talk to me and provide a statement today?"

The Defendant acknowledged he understood his rights and then made the alleged incriminating statements concerning distribution of methamphetamine in Washington and Idaho.  At the conclusion of the interview Agent Smith advised the Defendant he would want to come back for another interview with a Drug Enforcement Agency (DEA) officer along.

C. The February 7, 2009 Question About A Lawyer

Defendant Fry admitted at the May 8, 2009 evidentiary hearing that he was familiar with the legal system and that from the "moment [he] sat down in that room" he knew he had the right to remain silent and the right to an attorney.  Ct. Rec. 39 at 120, ln 2-11. Fry further testified at the hearing that in the very beginning of the interview as he and the investigating officers were entering the interrogation room, he asked the officers, "Do I get to have a lawyer to sit in?" Ct. Rec. 39 at 110, ln 24. According to the Defendant, the officers laughed at the question and asked no

ORDER - 6

questions about his inquiry concerning counsel. Agent Smith testified the attorney question was not asked.  For the following reasons, the court finds that in fact, Fry did ask if he needed an attorney to be present during his interview. The Government and the testifying officers have carefully denied that the Defendant ever "asked" for an attorney, "requested" an attorney, or in their opinion, "invoked his right" to an attorney.

Agent Smith and Detective Wolverton testified that had Fry asked for an attorney they would have ended the interview.  At the evidentiary hearing, when Agent Smith was questioned by defense counsel and the court as to whether at any point the Defendant had made *any statement* about an attorney, Agent Smith gave an unequivocal "no" answer. Because of the inconsistency of this testimony and the contrary statements in the Government's Response To Motion To Suppress  (Ct. Rec. 18 at 6) stating that Fry asked if he "needed an attorney" prior to being read his *Miranda* rights, Agent Smith was questioned concerning this inconsistency.  Agent Smith testified that he had told counsel for the Government what happened at the interview of Fry and also that he had discussed the issue of any attorney discussion or request with her.  When Detective Wolverton was asked whether he recalled the Defendant asking if he *needed* an attorney, Detective Wolverton testified he did not remember.  Ct. Rec. 39 at 107, ln 2.

As opposed to the testimony of Agent Smith and Detective Wolverton, the Government's position taken in their memorandum responding to the Motion To Suppress was that the Defendant *did* make a statement about an attorney:

> "At no time did the Defendant request an attorney, nor did he refuse to answer any questions or make a statement.  Instead, prior to receiving his Miranda warnings, <u>the Defendant asked do I need an attorney</u>.  <u>Agent Smith responded by explaining the federal system of cooperation and the potential benefit to the Defendant.</u>"

Ct. Rec. 18 at 6 (emphasis added).  During argument, counsel for the Government claimed these facts were not in the officers' reports and characterized the statement as

ORDER - 7

a "misstatement" which she could not explain being in the brief.  No further explanation was provided in the supplemental briefing to the court.

Given the nature of the statement, it is highly unlikely the position taken by the Government in its brief could have been simply a misstatement.  The Government's contradictory versions of whether or not the Defendant made reference to an attorney casts doubt on the assertion that the Defendant propounded no such question.  The Government's position taken in its brief and the Defendant's testimony concerning his disregarded attorney question are consistent. The court finds the weight of the evidence supports the finding that the Defendant *did* propound the question concerning his right to an attorney at  the beginning of the interview.  As explained below, it is unnecessary for the court to determine which of the two "attorney" statements were made.

**4. The Second Interview**

On or about Monday, February 9, 2009, the Defendant appeared before a judge for a bond hearing on the state charge from his arrest the Friday before.  The judge appointed counsel for him.  Ct. Rec. 39 at 55.  On Wednesday, February 11, 2009, Agent Smith and DEA Agent Matt Smith went to the Whitman County Jail to interview the Defendant about additional details of persons associated with his involvement in drug distribution.  They did not contact Defendant's counsel.  At some point during the agent's conversation with the Defendant he was Mirandized and he subsequently gave information which he now seeks to suppress..

**II.     DISCUSSION**

Defendant seeks to suppress all evidence obtained as a result of the search(es) incident to the February 6, 2009 arrest and his statements made to law enforcement on February 7 and February 11, 2009.   Defendant argues the search incident to that arrest was illegal because law enforcement lacked probable cause to arrest him. Defendant further contends his statements made to law enforcement the day

ORDER - 8

1   following his arrest should be suppressed because 1) he invoked his right to counsel,

2   but his request was ignored; and 2) because law enforcement engaged in

3   inappropriate "question-first" tactics.

4        The Government opposes the illegal arrest aspect of the motion arguing the

5   discovery of the pipe with controlled substance residue in the vest was made pursuant

6   to a legal search and provided probable cause for arrest.  The Government contests

7   that the Defendant invoked his right to counsel on February 7, 2009 and claims the

8   officer's softening up tactics prior to the giving of the *Miranda* warnings were not

9   unlawful nor did they result in an involuntary waiver of Fry's *Miranda* rights.

10  **A. Legality of the February 6, 2009 Arrest**

11       Defendant contends his arrest following the traffic stop was unlawful and

12  therefore the evidence obtained as a result of the subsequent search and questioning

13  following the arrest should be suppressed.

14       A warrantless arrest must be supported by probable cause. *United States v. Del*

15  *Vizo*, 918 F.2d 821, 825 (9th Cir. 1990). Probable cause exists if, "at the time the

16  arrest is made, 'the facts and circumstances within [the officers'] knowledge and of

17  which they had reasonably trustworthy information were sufficient to warrant a

18  prudent man in believing that the petitioner had committed or was committing an

19  offense' " *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001) (quoting Beck v.

20  Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *see also United States*

21  *v. Carranza*, 289 F.3d 634, 640 (9th Cir. 2002) ("Probable cause existed if under the

22  totality of the circumstances known to the arresting officers, a prudent person would

23  have concluded that there was a fair probability that [the suspect] had committed a

24  crime.") (internal quotation marks and citations omitted).

25       Defendant does not challenge the search of the vest, but rather argues the

26  officers did not have probable cause to arrest him for unlawful "use" of drug

27  paraphernalia based solely on the discovery of the pipe and syringes.   In Washington,

28  ORDER - 9

for possession of drug paraphernalia to be a crime there must be both possession of

drug paraphernalia and its use in drug-related activity. *See* RCW 69.50.412; *State v.*

*George*, 146 Wash.App. 906, 193 P.3d 693 (Wash.App. Div. 1 2008). Defendant

relies upon *George,* however that case is distinguishable from this one. The issue in

*George* was possession – whether the Defendant, could be deemed to be in

"possession" of the discovered pipe with burned marijuana in it, when the only

evidence was that it was found on the floorboard of a vehicle in which he was a

backseat passenger with two other occupants. There were no syringes discovered in

*George*.

Unlike in *George*, there is no issue in this case that Fry was in possession of

the pipe and syringes. That possession is not contested. Fry contests whether there

was any evidence of "use." Undisputedly, the syringes, pipe, and residue provide that

evidence and the officers had probable cause to arrest in this case after their

discovery. Defendant has not cited any case law which suggests to the contrary. The

arrest in this case was lawful.

**B. Legality of the Vehicle Search**

At the suppression hearing, as the court attempted to discern whether it was

necessary to hear testimony regarding the circumstances of the Defendant's arrest,

defense counsel raised an issue which had not been raised in the briefing. Counsel

argued that the legality of the vehicle search incident to arrest was now an issue

because of the Supreme Court's recent decision in *Arizona v. Gant*, 556 U.S. ----, 129

S.Ct. 1710, --- L.Ed.2d ---- (2009). In *Gant*, the Court held that a law enforcement

officer who arrests a vehicle occupant may search the vehicle if the officer has reason

to believe the vehicle contains evidence of the crime of arrest. *Id.*, at ----, 129 S.Ct., at

1723-1724. Defendant raised the argument that *Gant* would support the suppression

of the .22 caliber ammunition found in plain view by Detective Patrick after the

Defendant's February 6. 2009 arrest. According to the Government's brief, Detective

ORDER - 10

Patrick had observed the box of ammunition on the floor board of the driver's seat area of the pickup as he tended to the Defendant.   This fact was not contested by the defense, although defense counsel stated at the hearing the ammunition was found "in the passenger compartment" of the pickup. Ct. Rec. 39 at 9, ln 17.  *Gant* does not alter the plain view doctrine (and did not involve evidence seized in plain view). Accordingly because the ammunition was in plain view, *Gant* does not provide a basis for suppression of the box of ammunition seized from the vehicle.

As the court advised the parties at the evidentiary hearing, the court's ruling here does not mean that the evidence in the truck is necessarily admissible at trial of the federal charges now pending against the Defendant.  Ruling thereon must be reserved until the court hears the argument of counsel as to the admissibility thereof, the applicability of F. R. Evid. 404(b) and 403.

**C.    The Invocation of The Right to Counsel**

Defendant also seeks suppression of the post-*Miranda* warning incriminating statements made by the Defendant to the officers on February 7, 2009, arguing the agents ignored his invocation of his right to counsel at the initiation of the Defendant's custodial "interview" by the officers.

The Government bears the burden of demonstrating the admissibility of a confession. *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). This requires the government to prove by a preponderance of the evidence the compliance with the Bill of Rights of the United States Constitution and the judicially created rules in *Miranda v. Arizona* 384 U.S. 436, 470 (1966) and its progeny.  The Government also bears the burden to prove any alleged *Miranda* waiver and the voluntariness of any confession. *Seibert*, 542 U.S. at 608 n. 1, 124 S.Ct. 2601 (*citing Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)).  Despite this burden, the court notes that the Government's supplemental response on the issue

ORDER - 11

of the invocation of the right to counsel was entirely devoid of legal analysis of this complex, threshold issue. Its 6-line paragraph denying the Defendant ever "requested" an attorney (though admitting he asked "Do I need a lawyer?") lacked the analytical discussion called for here and was merely quotes from that case. Notwithstanding having provided the Government with the opportunity to provide supplemental briefing after the suppression hearing, most of the required analysis below was never addressed by counsel.

### 1. The Right to Counsel

While a suspect in a criminal investigation has no formal Sixth Amendment right to the appointment of counsel until judicial proceedings[1] have been initiated, an arrested person nonetheless has the right to the appointment of an attorney, to have counsel present during questioning, and to have police explain this right to him before any interrogation begins. *Miranda v. Arizona*, 384 U.S. 436, 469-73, 86 S.Ct. 1602 (1966). Such a right, established in *Miranda*, was one of a "series of recommended 'procedural safeguards' ... [that] were not themselves rights protected by the Constitution, but were instead measures to insure that the [Fifth Amendment] right against compulsory self-incrimination was protected." *Davis v. United States*, 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (*quoting Michigan v. Tucker*, 417 U.S. 433, 443-444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). The Court reasoned that the environment of a custodial interrogation is inherently intimidating and that without proper procedural safeguards, no statement obtained from a defendant can truly be a product of free choice. The fear of persistent investigators wearing down and badgering suspects until they confessed was cause for great

---

[1] Judicial proceedings against an accused include the "formal charge, preliminary hearing, indictment, information, or arraignment ." *United States v. Gouveia*, 467 U.S. 180, 188-189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984).

ORDER - 12

1    concern.

2    Under *Miranda*, a person may invoke his right to counsel at any time after

3    being taken in to custody, so long as it is in the context of an imminent custodial

4    interrogation.  *Miranda* states "if the individual indicates in any manner, *at any time*

5    *prior to or during* questioning, that he wishes to remain silent, or if he states that he

6    wants an attorney, the interrogation must cease." *Miranda*, 384 U.S. at 473-474.

7    Thus, a person in custody need not wait for the police to go through the *Miranda*

8    litany before asserting the right to counsel. *U.S. v. Kelsey*, 951 F.2d 1196 (10th Cir.

9    1991) (holding that a valid request for counsel need not be preceded by warnings

10   where the suspect is in custody); *State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992)

11   (holding that a suspect in custody may invoke his or her right to have counsel present

12   even before receiving *Miranda* warnings).

13   The assertion of the right to counsel is a "significant event" that calls for the

14   end of interrogation until counsel has been made available to the person in custody,

15   unless the accused himself initiates further communication, exchanges, or

16   conversations with the police.  *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct.

17   1880, 1884-85, 68 L.Ed.2d 378 (1981).  To implement this rule, the *Edwards* Court

18   held that any statements a suspect makes after requesting an attorney and before being

19   provided with one are not admissible unless it is clear that the suspect, and not the

20   police, initiated the dialogue. *Id*. at 485-87, 101 S.Ct. at 1885-86.

21   The applicability of the *Edwards* rule requires courts to "determine whether the

22   suspect actually invoked his right to counsel." *Smith v. Illinois*, 469 U.S. 91, 95, 105

23   S.Ct. 490, 83 L.Ed.2d 488 (1984).  "Invocation of the *Miranda* right to counsel

24   'requires, at a minimum, some statement that can reasonably be construed to be an

25   expression of a desire for the assistance of an attorney.' " *Davis v United States*, 512

26   U.S. 452, 459, 114 S.Ct. 2350 (1994)(quoting *McNeil v. Wisconsin*, 501 U.S. 171,

27   111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991)).  The *Davis* court articulated further

28   ORDER - 13

that **in interrogations taking place <u>after</u> a *Miranda* waiver**, only "unambiguous" and "unequivocal" requests for counsel trigger the protections of *Edwards*. *Davis*, 512 U.S. 452 (1994). *Id.* at 452. However, as discussed, *infra*, as established by the Ninth Circuit in *United States v. Rodriguez*, 518 F. 3d 1072 (2008), a **pre-*<u>Miranda</u>* <u>waiver</u>**, ambiguous request by a person in custody concerning the right to counsel requires the interviewing officer(s) to stop any questioning or interview and clarify and determine the Defendant's request concerning counsel.

In *Davis*, the Defendant stated "Maybe I should talk to a lawyer," **<u>after</u>** having been read the *Miranda* warnings and having initially waived his rights orally and in writing.   Agents clarified that remark with the Defendant, who said he didn't want a lawyer.  Eventually, Davis made an unequivocal request for counsel and questioning ceased.  Davis had argued that the interrogation should have stopped when he first made the remark about a lawyer and the Government argued that the proper response was to ask clarifying questions, which the agents had done. The Court in *Davis* believed that the suspect's remark was not a clear request for counsel and, thus, held that the law enforcement officers did not violate the suspect's Fifth Amendment privilege against compulsory self-incrimination by continuing to question him after clarifying whether the defendant was requesting counsel, which he was not.

The *Davis* court acknowledged that it was "good police practice" for the interviewing officers to seek clarification of a suspect's ambiguous or equivocal reference to an attorney. *Id.* at 461.  Clarifying questions protect the suspect's rights by insuring that he gets an attorney when he wants one and minimize subsequent judicial second guessing as to whether the suspect was actually invoking his right to counsel. *Id.*  However, the Court declined to require officers to ask clarifying

ORDER - 14

questions to ambiguous **post**-*Miranda* statements. *Id.* at 461-62.[2]

Prior to *Davis*, however, in the majority of courts, including the Ninth Circuit, the law had required clarification whether the question of the right to have counsel present was raised by the Defendant **before** or **after** the waiver of the *Miranda* rights. The pre-*Davis* rule was that where there was an equivocal or ambiguous assertion of a constitutional right then all questioning must cease, except inquiry strictly limited to clarifying the request. *United States v.* Endell, 860 F.2d 1528 (9th Cir. 1988); United *States v. Fouche*, 776 F.2d 1398, 1405 (9th Cir.1985), after remand, 833 F.2d 1284, 1287 (1987); *United States v. Nordling*, 804 F.2d 1466, 1470 (9th Cir.1986);  *Nelson v. McCarthy*, 637 F.2d 1291, 1296 (9th Cir.1981).

----

[2]  Justice Souter, joined by Justices Blackmun, Stevens, and Ginsburg, disagreed with the majority's conclusion that police are not required to stop questioning when a suspect makes an equivocal request for counsel, and would require that "when a suspect under custodial interrogation makes an ambiguous statement that might reasonably be understood as expressing a wish that a lawyer be summoned (and questioning cease), interrogators' questions should be confined to verifying whether the individual meant to ask for a lawyer." 512 U.S. at 476, 129 L. Ed. 2d at 382 (Souter, J., concurring in the judgment).  Justice Souter commented "[T]he concerns of fairness and practicality that have long anchored our Miranda case law point to a different response: when law enforcement officials reasonably do not know whether the suspect wants a lawyer,' they *should* stop their interrogation and ask him to make his choice clear."  Because the officers in Davis did in fact ask clarifying questions, and only continued the interrogation when the petitioner said, "No, I'm not asking for a lawyer" and "No, I don't want a lawyer," the concurring judges agreed with the majority that the petitioner's rights were not violated.

ORDER - 15

Recently, in *United States v. Rodriguez*, 518 F.3d 1072 (2008), the Ninth Circuit analyzed the effect of *Davis* on this circuit's required clarification rule. The court joined several others in restricting *Davis* to its facts arising in the **post-waiver** context. As established in *Rodriguez*, *Davis'* requirement that police receive unequivocal assertion from a Defendant of his right to counsel to require police to discontinue questioning of a Defendant pertains only to the situation in which defendant has **previously received** *Miranda* warnings, has waived those rights, and then, during interrogation, makes an equivocal statement regarding exercise of his right to counsel. This is opposed to the *Rodriguez* situation in which a Defendant makes an ambiguous invocation of right to counsel **prior** to waiver of the right to counsel. *Rodriguez* expressly held that *Davis* does not abrogate the Circuit's clarification rule in the **pre-wavier** context. "[P]rior to obtaining an unambiguous and unequivocal waiver, a duty rests with the interrogating officer to clarify any ambiguity before beginning general interrogation." *United States v. Rodriguez*, 518 F.3d 1072 (2008)("To the extent Nelson requires pre-waiver clarification of a suspect's wishes concerning his Miranda rights, **it has not been superseded by Davis**, and remains binding precedent.") (emphasis supplied); *see also Nom v. Spencer*, 337 F.3d 112, 118 (1st Cir.2003); *State v. Collins*, 937 So.2d 86, 92 (Ala.Crim.App. 2005); *State v. Freeman*, 158 Md.App. 402, 857 A.2d 557, 572-73 (Md.App. 2004); *State v. Tuttle*, 2002 SD 94, ¶ 14, 650 N.W.2d 20, 28; *State v. Leyva*, 951 P.2d 738, 743 (Utah 1997).

Fifteen years of federal and state court decisions interpreting the *Davis* decision provide a broad range of suspect statements under a variety of circumstances. For example, the following statements were found to be ambiguous or equivocal: "Maybe I should talk to a lawyer," *Id.* at 462, 114 S.Ct. at 2357, 129 L.Ed.2d at 373; "If I need a lawyer, tell me now," *State v. Harris*, 741 N.W.2d 1, 6 (Iowa 2007); "I think I need an attorney," *State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997); "You want to arrest me for stealing a car, then let me call a lawyer and I'll have a lawyer appointed to me

ORDER - 16

1  and, because this is going nowhere," *State v. Spears*, 184 Ariz. 277, 908 P.2d 1062,

2  1071 (Ariz.1996); "Can I have someone else present too, I mean just for my safety,

3  like a lawyer like y'all just said?", *Commonwealth v. Hilliard*, 270 Va. 42, 613 S.E.2d

4  579, 585 (Va. 2005).  As Justice Souter pointed out in his *Davis* concurrence, "social

5  science confirms what common sense would suggest, that individuals who feel

6  intimidated or powerless are more likely to speak in equivocal or nonstandard terms

7  when no ambiguity or equivocation is meant."

8         In comparison, courts have determined the following statements were

9  unambiguous and unequivocal requests for counsel: "We're going to do it with a

10  lawyer. That's the way I got to go," *State v. Harris*, 741 N.W.2d 1, 7 (2007); "Can I

11  get an attorney right now, man?";  *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir.

12  1999); "Can I get a lawyer in here?",  *Commonwealth v. Hilliard*, 270 Va. 42, 613

13  S.E.2d 579, 586 (Va.2005)*.

14         **2. Defendant's Ambiguous Question**

15         In this case, as stated, *supra*, the Defendant's statement or question about the

16  need for an attorney was **prior** to the reading of his *Miranda* rights, **prior** to the

17  subsequent waiver, and **prior** to the interviewing agents' "softening up" and

18  questioning.  As the court has found, as the Defendant and the two investigators

19  entered the interview room, after having been introduced to Agent Smith and

20  Detective Wolverton and after having been told they were going to talk to him

21  concerning an investigation about his alleged drug distribution, the Defendant uttered

22  either the question "Do I get a lawyer to sit in?" (Defendant's version) or "Do I need a

23  lawyer?" (Government's version).

24         The statement "Do I get a lawyer to sit in?" is a direct question which could

25  under some circumstances qualify as an unambiguous expression of the desire for the

26  help of a lawyer, triggering the protection of *Edwards*.  *State v. Dumas*, 750 A.2d 420

27  (R.I. 2000)(holding that "can I get a lawyer?" could reasonably be a request for

28  ORDER - 17

counsel in some circumstances); *Commonwealth v. Hilliard*, 270 Va. 42, 613 S.E.2d 579, 586 (Va.2005)("can I get a lawyer in here?").  However, most courts have found this type of question to be ambiguous and a way of asking for clarification of one's rights. *See Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir.1999).

The statement "Do I need a lawyer" is apparently the most frequently asked questions by suspects facing custodial interrogation.  *Marcy Strauss*, Understanding Davis v. United States, 40 Loy.L.A.Law Rev. 1011, 1035 (2007).  Courts have found this statement to be a request for advice and not an unequivocal request for counsel. *See Diaz v. Senkowski*, 76 F.3d 61, 63-64 (2nd Cir.1996) (holding that use of the words "Do you think I need a lawyer?" immediately following the words "I think I want a lawyer" rendered the request equivocal); *State v. Walkowiak*, 183 Wis.2d 478, 515 N.W.2d 863, 867 (1994) (holding that suspect's question "Do you think I need an attorney?" was equivocal).  The Ninth Circuit has recognized that "[o]ur own precedent is not much help since it is somewhat inconsistent on what constitutes an equivocal request for a lawyer." *Clark v. Murphy*, 331 F.3d at 1070.  There is, however, a line of Ninth Circuit cases which hold that asking an officer's opinion about the right to counsel is neither an unequivocal invocation nor an equivocal request requiring clarification.  *Norman v. Ducharme*, 871 F.2d 1483, 1486 (9th Cir. 1989); *U.S. v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994)(defendant's question, "Do I need a lawyer" or "Do you think I need a lawyer" does not "rise to the level of even an equivocal request for an attorney"); *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003)((defendant's statement "I think I would like to talk to a lawyer" was ambiguous).

The court finds that it is not legally determinative as to  which specific statement the Defendant made or whether the question by Fry should be classified as an ambiguous or unambiguous question.  The result is the same. In comparing the circumstances of this case with those in this Circuit as well as many other cases, the

ORDER - 18

court finds that given the circumstances and context of the statement here, either
formulation of Defendant's question qualified as an ambiguous or equivocal request
for counsel.  Though Defendant's statement was not made in the context of an initial
advisement of rights, it was made in the context of an imminent custodial interrogation
and there is no need for a Defendant to wait for the *Miranda* litany to invoke his right.
The investigating agents were not only experienced, but also aware of this Defendant's
relatively extensive prior history in the state criminal justice system.  The question
here is one that was prefatory to and perhaps determinative of the Defendant's
invoking of his right to counsel.  Defendant Fry was very clearly seeking basic
information concerning his right to counsel just as the interview was about to begin.
The question was clear enough that a reasonable officer in light of the circumstances
would have understood that the suspect *might* be invoking the right to counsel.  As
such, Agent Smith had a duty to clarify the ambiguity before proceeding with an
interview and interrogation. *See Rodriguez*, 518 F.3d at 1080.

### 3. Agent Smith's Failure to Clarify the Ambiguity

Having determined the Defendant made an ambiguous assertion of the right to
counsel, the court looks at the agent's response.  Neither form of the Defendant's
reference to counsel was so nebulous that the experienced interviewing officer could
not have immediately formulated a proper response.  Instead of formulating a
straightforward answer or using the opportunity to ask a clarifying question to
determine whether the Defendant desired to have counsel present, Agent Smith
( a) ignored the question and proceeded to discuss the detail of his knowledge of the
drug investigation involving the Defendant and the benefits of cooperation; and b)
intentionally withheld the reading of the *Miranda* rights until after conditioning the
Defendant to waive his rights by describing the evidence against him, explaining that
his benefit would never be better than on that day because the first "on the
[cooperation] bus" "get the best seats", and by making the Defendant's situation

ORDER - 19

appear hopeless in the face of a potential life sentence (and being "run over" by the bus).

Agent Smith's statements to the Defendant did not in any manner clarify whether the Defendant was invoking his right to have an attorney present.  Agent Smith ignored and deflected the Defendant's initial inquiry about counsel.  Moreover, the court rejects the suggestion that any ambiguity was resolved when the Defendant failed to specifically request counsel. Agent Smith proceeded with the "softening-up" process including the parade of horribles as to what might await him in the way of sentencing and its affect on Fry's family.  Once Fry indicated he would make incriminating statements Agent Smith then read him his *Miranda* warnings.  The *Miranda* warnings did nothing to clear up whether the Defendant in fact wanted to have an attorney present at the commencement of the "interview."  *See Towne v. Dugger*, 899 F.2d 1104*, 1110 (11th Cir. 1990); United States v. Porter*, 764 F.2d 1 (1st Cir.1985); *State v. Leyva*, 951 P.2d 738, 743 (Utah 1997)(statements that acknowledge or reaffirm the defendant's *Miranda* rights do not serve as clarifying statements).  If the Agent had given the *Miranda* warnings *in response* to the Defendant's question or at least acknowledged the prior question in some way, this issue might be a closer call.  However, clarification necessarily implies that the equivocal request must be acknowledged by the interrogator.  An equivocal request is not clarified by being ignored.  Agent Smith did not clarify the assertion when he ignored the question and instead used the opportunity to *persuade* the Defendant rather than *discern* the Defendant's intent.

The technique used by Agent Smith here is analogous to that utilized in the Ninth Circuit's pre-*Davis* clarification case, *Smith v. Endell*, 860 F.2d 1528 (9th Cir. 1988).  The *Endell* court's conclusion is consistent with this court's conclusion herein.  In *Endell*, instead of clarifying the suspect's ambiguous desire for counsel the troopers "used his question as an occasion for repeatedly cataloguing the evidence connecting

ORDER - 20

1  him with the murders." 860 F.2d at 1532.  According to the court,

> 2  The resulting drawn out dialogue was wholly unnecessary to the only proper
> 3  purpose of further questioning: the clarification of Smith's initial
>    statement...The repeated recitations of the circumstances tying Smith to the
>    murders did nothing to clarify Smith's desire for counsel.  It was a powerful-
> 4  though subtle-inducement for him to confess.

> 5  The prophylactic rule established in *Miranda* and *Edwards* was intended to
> 6  preclude the kind of technique employed by the troopers in this case to induce
>    Smith to forego his initially expressed desire for counsel and incriminate
>    himself.  Questioning after an ambiguous or equivocal request for counsel 'is to
> 7  be limited to...clarification and cannot be used as a means of eliciting any
>    incriminating statements from the suspect relating to the subject matter of the
> 8  interrogation.'

9  *Endell*, 860 F.2d at 1533.

10       Like in *Endell*, the court finds that both the *Miranda* and *Edwards* rules,

11  designed to protect an accused in custody from being badgered in the manner the

12  Defendant was, have been violated and require suppression of the Defendant's

13  statements made on February 7.  Though the court acknowledges that the *Edwards*

14  facts involved a "clearly asserted" invocation of the right to counsel, the court finds

15  that the unclarified, pre-waiver, ambiguous reference to counsel is most analogous to

16  and must be treated and analyzed as though it were a clear request for counsel (thus

17  triggering the protection of *Edwards*) until and unless the suspect's intent is clarified

18  otherwise.  This is consistent with the Supreme Court's "settled approach" that a

19  defendant's request for counsel is to be given a broad rather than a narrow

20  interpretation.  *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).  Where the

21  Defendant's intent by his "do I need/get a lawyer" question was never clarified and the

22  advice of counsel previously was never provided, *Edwards* precludes introduction of

23  any further statements made as a result of police-initiated communications.

24       The Government contends that regardless of the agent's failure to immediately

25  clarify the Defendant's intent, his statements are nevertheless admissible because the

26  Defendant voluntarily made them after being fully informed of his *Miranda* rights and

27  waiving them prior to the start of any questioning by Agent Smith.  This argument

28  ORDER - 21

1    raises two separate questions: 1) whether it was possible for the Defendant to have
2    effectively waived his right to counsel despite the agent's failure to clarify; and 2)
3    whether despite a violation of *Miranda* and *Edwards*, the statements are admissible
4    under *Oregon v. Elstad*, 470 U.S. 298 (1985).

5           As to the former question, the court concludes the failure of law enforcement to
6    clarify precludes a valid waiver, and therefore taints the Defendant's subsequent
7    confession.  A defendant who has been advised of his *Miranda* rights may waive them,
8    as long as such waiver is knowing, intelligent, and voluntary relinquishment or
9    abandonment of a known right or privilege under the totality of the circumstances. *See*
10   *Moran v. Burbine*, 475 U.S. 412, 422-23, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).
11   Logically, however, it is impossible for a defendant who has ambiguously invoked his
12   right to counsel to waive that right unless law enforcement clarifies the defendant's
13   ambiguous statement and/or intent in the first place.  *See e.g.*, *Minnick v. Mississippi*,
14   498 U.S. 146 (1990)(valid waiver cannot be established by showing that defendant
15   responded to further questions).  The *Edwards* bright line rule also precludes the
16   police from re-administering the warnings and initiating interrogation with a suspect
17   who has already invoked his right to counsel.   Otherwise, "authorities through
18   'badgering' or 'overreaching' --explicit or subtle, deliberate or unintentional--might
19   otherwise wear down the accused and persuade him to incriminate himself
20   notwithstanding his earlier [counsel ] request." *Smith v. Illinois*, 469 U.S. 91, 98, 105
21   S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) (per curiam) (brackets omitted).   Even if it
22   were deemed possible for a Defendant to waive his rights following an <u>unclarified</u>
23   ambiguous request for counsel, on the facts presented here, the Government would not
24   be able to meet its burden to show the Defendant knowingly and intelligently waived
25   his right to counsel further precludes admission of the statements made on February 7,
26   2009.  *Rodriguez,* 518 F.3d at 1080-81.

27          As to the second question raised by the Government's argument, the court
28   ORDER - 22

acknowledges the Supreme Court's decision in *Oregon v. Elstad*, 470 U.S. 298 (1985), wherein the Court held that if a statement made inadmissible by *Miranda* is otherwise voluntary, constitutional jurisprudence does not require suppression of its "fruits." *Elstad*, 470 U.S. at 307-308.   In other words, where a confession taken in violation of *Miranda* rights is followed by a subsequent confession, the admissibility of the second turns not on whether it was "tainted" by the first violation, but simply whether it was voluntary.  The Court stated:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad* at 298.  The court reasoned that *Miranda* violations are not always violations of the Fifth Amendment and therefore do not *automatically* establish the inadmissibility of the evidence obtained.

This case does not fit the *Elstad* framework.  *Elstad* involved the "simple failure to administer the warnings," as opposed to the disregard of the Defendant's invocation of the right to counsel.  In fact, in a footnote, the *Elstad* majority expressly distinguished the case from those involving statements elicited after invocation of a *Miranda* right.  *Elstad*, 470 U.S. at 312-13, n. 3 ("Likewise inapposite are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation.").  Moreover, this case is distinguishable from *Elstad* as in this case there *were* improper or coercive tactics employed by the police.  *Elstad*, 470 U.S. at 314.

What occurred here was not simply a technical violation of *Miranda* or a failure

ORDER - 23

1  to give *Miranda* warnings as in *Elstad*. Agent Smith's failure to clarify the

2  Defendant's ambiguous request concerning his right to counsel was explicitly

3  prohibited by the Ninth Circuit in *Rodriguez*, 518 F.3d 1072 (2008). Agent Smith's

4  subsequent coercive dialogue and interrogation of the Defendant violated the doctrines

5  established in *Miranda* and *Edwards,* designed to ensure the voluntariness of the Fifth

6  Amendment waiver, as well as the right to counsel secured by the Fifth, Sixth and

7  Fourteenth Amendments. *See e.g., Oregon v.* Bradshaw, 462 U.S. 1039, 1043

8  (subsequent incriminating statements made without an attorney present violated the

9  rights secured by the Fifth and Fourteenth Amendments); Towne *v. Dugger*, 899 F.2d

10  1104, 1110 (11th Cir. 1990)(confession obtained after police failed to clarify an

11  equivocal request for counsel and after further police-initiated questioning was a

12  violation of the Fifth Amendment and required suppression). The court's rulings here

13  are similar to those conclusions reached in well-reasoned opinion in *State of Utah v.*

14  *Sampson*, 808 P.2d 1100 (1990), cert. denied, 817 P.2d 327 (Utah 1991), cert. denied,

15  112 S. Ct. 1282 (1992). Accordingly, the admissions obtained on February 7, 2009

16  must be suppressed.

17  **D. *Seibert* and Voluntariness of the Waiver**

18  While the court must suppress the Defendant's statements because of the Fifth

19  and Sixth Amendment violations, it will also address the other claimed grounds for

20  suppression.

21  Defendant argues that his statements must be suppressed because the agent's

22  interrogation approach was the non-*Miranda* "question first" strategy which was

23  determined to preclude the admission of post-*Miranda* admissions on the same

24  subject. *Missouri v. Seibert*, 542 U.S. 600 (2004). The *Seibert* decision is relevant as

25  that decision specifically identified a police interrogation technique involving the

26  post-admission mid-stream reading of the *Miranda* warnings after obtaining a non-

27  *Mirandized* confession. The so-called "question first" technique, however, was not

28  ORDER - 24

the technique employed here. "Question-first" involves successive unwarned and warned interrogation phases, where the warnings are withheld until the initial interrogation succeeds in eliciting a confession. The technique employed by Agent Smith, though questionable in light of *Seibert*, was not the "question first"technique because the facts here did not involve an unwarned interrogation phase, but rather the "softening-up" technique by telling Fry of the alleged evidence against him, a possible life sentence if he did not cooperate, and the resultant consequences to his wife and children. When Fry then agreed to cooperate and answer questions, he was then read the *Miranda* warnings. Fry's earlier "do I need/get a lawyer" question was never addressed.

Though this court does not necessarily favor the trend, a developing body of *post-Seibert* case law suggests the tactic of strategically timing the *Miranda* warnings after the officer talks to the suspect about the alleged evidence and it consequences (but does not question) the suspect does not itself inherently render the warnings ineffective. *Hairston v. United States*, 905 A.2d 765 (D.C. 2006)(instructing the murder suspect to "just listen" while the officer recounted the evidence against the suspect and telling him they wanted to hear his side of the matter ); *U.S. v. Gonzalez-Lauzan*, 437 F.3d 1128, 1130-32 (11th Cir. 2006)(*Miranda* warnings were effective where prior to the warnings the officers asked the defendant no questions and cautioned him to not make any statements while describing the facts they knew and indicating that they had a strong case against him); *U.S. v. Peterson*, 414 F.3d 825 (7th Cir. 2005)(agents described the evidence against the defendant in a fifty-minute post-arrest narration, telling him to be silent every time he tried to speak, then they gave the warnings and obtained a waiver. The *Peterson* court admitted the confession because the Defendant had not made any pre-warning statement and because the tactic did not undermine *Miranda* ("none of his rights had been diluted."); *United States v. Washington*, 462 F.3d 1124, 1129 (9th Cir. 2006)(FBI agents described the charges

ORDER - 25

and told the suspect about his opportunity to cooperate, then gave the warnings). These cases appear to deem it acceptable that so long as the police do not pose direct questions to the suspect agents may describe the evidence, the charges, and the opportunity to cooperate prior to administering the warnings. The Ninth Circuit has indicated "there is nothing inherently wrong with efforts to create a favorable climate for confession." *Clark v. Murphy*, 317 F.3d 1038, 1049 (9th Cir. 2003)(quoting *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988).

Agent Smith's statements,  however,  crossed the line between "creat[ing] a favorable climate for confession" and engaging in unconstitutional psychological coercion designed to coerce Fry to waive his right to counsel.  *See United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (the defendant's confession was involuntary when it was induced by an interrogating officer who accused the defendant of lying, recited the maximum penalties of crimes that could be charged, threatened the defendant that she might not see her two-year-old child if she went to prison, and promised the defendant that the agent would inform the prosecutor if she cooperated or refused to cooperate).

The following facts are relevant here: The Defendant did not volunteer or ask to be interviewed by the agent, rather he was escorted in handcuffs to the county jail's interview room after an unrelated arrest.  The Defendant, though not a stranger to the criminal justice system, had never faced federal charges before.  The agent ignored the Defendant's inquiry about his right to a lawyer.  Of course, a suspect is much less likely to try to request counsel in a later interrogation  when the initial inquiry or request is ignored or denied.  *Marcy Strauss*, Understanding Davis v. United States, 40 Loy.L.A.Law Rev. 1011, 1059 (2007).   Moreover, it was a Saturday – a day the public defenders office was closed.  The agent propounded the alleged evidence against him.  The agent told the Defendant that with his criminal history he could be facing a potential sentence of life in prison, but that if he should choose to cooperate

ORDER - 26

1   the agent would so inform the prosecutor.  The agent advised the Defendant that if he

2   cooperated he likely would only be facing 10-20 years.  The agent advised the

3   Defendant that it would absolutely be to his benefit if he decided to cooperate "up

4   front" and assist in furthering the investigation.  The agent referred to the Defendant's

5   wife and children's future, at which point the Defendant became emotional. All of this

6   took place while the Agent intentionally withheld the advise of constitutional rights

7   per *Miranda* and did not respond to the Defendant's initial question asking whether he

8   was entitled to or needed a lawyer.

9       What makes the totality of these circumstances cross the line into the field of

10  coercive practices, however, is the agent's further use of the "bus analogy" and the

11  fact that the agent told Fry that his "deal would never be better than it was that day."

12  Ct. Rec. 39 at 30, ln 21-22; *see also*, Ct. Rec. 18 at 6-7.  The bus analogy contained an

13  element of threat.  The implication of the agent's statements was that if the Defendant

14  elected to exercise his right to counsel that day, that would preclude him from ever

15  getting the opportunity to cooperate with the agents, which according to the advice of

16  the agent, could result in a life sentence and the Defendant being "run over" by the

17  cooperation bus.  Defendant's testimony confirms this.  Defendant testified that he

18  acceded to questioning because "I felt like I was in a corner.  You know, I felt like my

19  whole world caved in."  Ct. Rec. 39 at 117, ln 13-16.  An accused does not have to

20  choose between his right to counsel and cooperating with the police.  But the agent

21  implied by his statements that the Defendant would be penalized for the exercise of his

22  right to counsel.  The net result here is that the agent's comments allowed the officer

23  to avoid honoring the Fifth and Sixth Amendments, enabled him to wear down the

24  accused, and persuade him to incriminate himself.  Accordingly, the Defendant's

25  waiver cannot be said to have been voluntary.  The Fifth and Sixth Amendments do

26  not tolerate police practices that frustrate the Defendant's desire for counsel.

27  Accordingly, these facts  provide an additional basis that require the suppression of

28  ORDER - 27

1  the Defendant's statements on February 7, 2009.

2  **E. Admissibility of the Statements from the Second Interview**

3       The court has determined that Fry's constitutional right to counsel was violated

4  at the time of his first interrogation on February 7, 2009 as the interrogating agent

5  failed to clarify Fry's ambiguous question concerning counsel at the beginning of the

6  interview.  Additionally, the court has ruled that the Agent's coercive statements

7  prevented a voluntary, knowing and intelligent waiver of the Defendant's rights.  The

8  court must also determine whether the statements made at the second interview on

9  February 11, 2009 must also be suppressed.

10       At the May 8, 2009 suppression hearing, the testimony in regards to the

11  February 11, 2009 interview was limited because the court had indicated that it was

12  under the impression that there were no disputed facts as to what took place at the

13  second interview.   The testimony was therefore focused on the February 7, 2009

14  interview. However, upon further review, it appears that there could  be disputed facts

15  concerning the February 11, 2009 statements.

16       It is the court's understanding, that on Wednesday, February 11, 2009, Agent

17  Smith and a DEA Agent returned to the Whitman County Jail with the intention of

18  obtaining an additional statement from the Defendant. Agent Smith testified that when

19  they arrived the Defendant was visibly upset with Agent Smith.  According to Agent

20  Smith's testimony when it appeared the Defendant was not going to cooperate further,

21  Agent Smith told the Defendant "it's your decision, but don't be upset with me if you

22  don't like how this ends." Ct. Rec. 39 at 51, ln 7.  According to Smith, Fry then

23  "calmed down and indicated he wished to cooperate" (Ct. Rec. 39 at 51, ln 8-9).  Fry

24  was then read his *Miranda* warnings, and he proceeded to further incriminate himself.

25  Agent Smith testified that he assumed the Defendant had previously been appointed

26  counsel on the state case, but he did not attempt to contact the attorney prior to the

27  interview.

28  ORDER - 28

Because of the court's statement that it appeared there were no disputed facts concerning the February 11, 2009 interview, the Defendant did not testify at all to those events and thus did not testify to his allegations contained in his brief that he had again asserted that he wanted a lawyer prior to being Mirandized. At the suppression hearing, neither the Defendant nor Agent Smith addressed Defendant's additional contention that prior to being Mirandized Agent Smith tried to convince him to cooperate by asking him "how it would look if he went back to the prosecutor and told the prosecutor that Defendant had lied to him and was not cooperating." Ct. Rec. 12 at 4.

The court finds there are possible factual questions remaining regarding the second interview and the admissibility of the statements therefrom. The Government carries the burden of demonstrating the voluntariness of the waiver and confession from the second interview. One question is whether the statements made at the second interrogation suffered from the taint of the constitutionally infirm first interview. "The circumstances surrounding a prior illegal confession may in some cases carry over and taint a subsequent confession ... even if the accused has been advised of his Miranda rights prior to the second confession." *United States v. Lee*, 699 F.2d 466, 468 (9th Cir.1982); *see also*, *Desire v. Attorney General*, 969 F.2d 802, 805 (9th Cir.1992) (holding *Edwards* violation not cured by reading of Miranda rights before defendant confessed). Answering the question of taint also requires an analysis of whether the coercive elements of the first interview carried over and tainted the second. Factored into this analysis must also be the elements of coercion present in the Agent's pre-*Miranda* statements during the second interview, including "but don't be upset with me if you don't like how this ends."

In addition, the court believes the facts warrant addressing whether the second statements were obtained in violation of the Defendant's <u>Sixth</u> Amendment right to counsel. When the second interview occurred in the absence of counsel, the

ORDER - 29

Defendant was represented by counsel on the state drug charge of his arrest and Agent Smith was on notice that the Defendant was represented. As of the date of the second interview, February 11, 2009, that contact with Fry would have violated the rule announced in *Michigan v. Jackson*, 475 U.S. 625 (1986) which forbade  police from initiating interrogation of a criminal defendant once he had been appointed counsel. *Jackson* was overruled on May 26, 2009 (after the suppression briefing had been completed) by *Montejo v. Louisiana*, 556 U.S. ___, 129 S. Ct. 2079, 77 USLW 4423 (May 26, 2009).

Because the parties did not have the benefit of the court's ruling on the admissibility of the first confession and the *Montejo* opinion had not been filed,  the supplemental briefing did not address any of these issues. In order that the court can determine if a further evidentiary hearing on the February 11, 2009 interrogation is needed, counsel shall file a statement and brief thereon within seven days from the date of this Order. If new counsel for the Defendant needs additional time, the court will honor such a request. In addition, counsel should include any authority and argument concerning the admissibility of the second interrogation, not to exceed ten pages.  The court will then determine if a further evidentiary hearing is required, and if not, will set a trial date after a telephonic conference with counsel. The court recognizes that Mr. John Miller has only recently been appointed to represent Mr. Fry and if requested, the court will grant Mr. Miller additional preparation time.

## III. CONCLUSION AND ORDER

For the foregoing reasons the evidence seized at the time of the Defendant's arrest will not be suppressed, with the issue of its relevancy and admissibility under the Federal Rules of Evidence. to be determined. The Defendant's statements made on February 7, 2009 are suppressed for the reasons stated herein.

**IT IS HEREBY ORDERED**: Defendant's Motion to Suppress (Ct. Rec. 12) is DENIED IN PART and GRANTED IN PART and RESERVED IN PART.   Counsel

ORDER - 30

1  shall file supplemental briefing within seven (7) calendar days, not to exceed ten (10)

2  pages, addressing whether there is a need for a further evidentiary hearing and the

3  admissibility of the statements obtained from the second interview in light of the

4  court's ruling herein.  If Mr. Miller, the newly appointed counsel for Mr. Fry

5  determines that additional time is needed for preparation or response to this Order, the

6  court will honor such a request after a telephonic telephone conference with both

7  counsel.

8       A trial date will be set after a telephonic conference with counsel.

9       **IT IS FURTHER ORDERED** that pursuant to 18 U.S.C. § 3161(h)(1)(D) &

10  (H), the time from March 19, 2009, the date of the filing of the motion to suppress to

11  June 15, 2009, being thirty days from the submission date of May 15, 2009, is hereby

12  excluded from the Speedy Trial Act time calculations.

13       The Clerk of the Court is directed to enter this order and furnish copies to

14  counsel.

15       Dated this 16th day of June, 2009.

16                    s/ Justin L. Quackenbush
                   JUSTIN L. QUACKENBUSH
17            SENIOR UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28  ORDER - 31